[No. 4701–1. Division One. March 14, 1977.]

*In the Matter of the Welfare of* JUSTIN
NATHANIEL SCHULZ.

ELDON SCHULZ, ET AL, *Petitioners,* V. THE DEPARTMENT
OF SOCIAL AND HEALTH SERVICES, *Respondent.*

*Selinker, Hillenbrand, Vestal & Klockars, M. Margaret Klockars, Demco & Erickson, John W. Demco,* and *Janice Whitley,* for petitioners.

*Slade Gorton, Attorney General,* and *Kenneth MacIntosh, Assistant,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

This case is before us on certiorari to review a juvenile court order permanently depriving a husband and wife, Eldon Carl Schulz and Heidi Pamela Schulz, of all parental rights in and to their child, Justin Nathaniel Schulz, an infant. CAROA 57(b)(3).

The paternal grandparents, Carl and Tena Schulz, whose petition to intervene in the juvenile court proceeding was granted, ask that we review the order of that court by which they were deprived of any legal priority to the care, custody and control of the child.

The juvenile court entered detailed findings of fact in support of its conclusions of law and deprivation order. We summarize them.

Two years before this child was born, the mother had another child whom she relinquished for adoption when the child was 3 or 4 months old. The child in the present case was born to these parents on July 23, 1974. Both before and after the birth of the child with whom we are here concerned, the mother was involved in a maternal and infant care program at the University of Washington Hospital. That program was designed to extend medical and social services to families shown to be of high medical or social risk. Following the birth of the child, he resided with his parents, and the mother and child were visited weekly by a public health nurse as a part of the program. In addition, the paternal grandmother stayed with the parents for about 2 weeks after the baby was taken home from the hospital.

Despite this assistance, the mother was overwhelmed with the responsibility of caring for the baby. The father

provided little support or assistance. As a consequence, the baby had to be hospitalized at 6 weeks of age, where his condition was diagnosed as failure to thrive, secondary to maternal deprivation.

After several days in the hospital, the baby was released and shortly thereafter was put into foster home care with the consent of the parents.

At the time the baby was placed in foster care, he was unresponsive, thin and physically weak. As the foster mother testified, the child was so weak that its cry could scarcely be heard. She also testified that she experienced no difficulty in feeding the child and he rapidly gained weight and strength in her care.

Initially, the foster care was intended to be temporary. The parents were given extended visitation rights and a case plan was worked out which included parenting classes and counseling at the Ryther Child Center as well as case-work services from the State Department of Social and Health Services, Child Protection Service. Some overnight visitations of the child with the parents at their home were arranged. On return from such visitations, the child evinced such problems as lack of appetite, diarrhea and facial rash.

Both of the parents had emotional and personality prob-lems as well as marital problems. Their cooperation with those who were making an effort to reestablish their rela-tionship with the child was erratic, and their visitations with the child sporadic. The mother did not visit the child at all from mid–April of 1975 to June or July of 1975.

Because of these problems, the foster home placement had to be put on a more permanent basis. By July of 1975, neither parent had indicated by words or action that they could handle the responsibility of full–time custody of the child, even though the caseworker spoke with them directly about it and had informed them of the child's real need for permanent placement. It was in that month that a case-worker filed a petition asking for the child to be declared a dependent child, that the parents be permanently deprived

of their parental rights and that the child be placed in the department's custody for adoptive placement.

Following the juvenile court fact–finding hearing, the court also found that

> The minor child has suffered significant psychological damage and is highly primed for future disruption; the minor child is in need of a solidly supportive environment; more than one custodial move for the minor child would be devastating to the psychological and emotional health of the minor child, and any delay in implementing the permanent placement of the minor child would be detrimental to the minor child.

As to the grandparents, the juvenile court found that the child "will require extremely skilled, attentive, long–term, and clearly defined adult parents" (the paternal grandparents were 58 and 64 years old) and that for the child to go with the grandparents would increase the exposure of the minor child to additional risks. The juvenile court in its oral opinion and findings, expressed considerable concern over the grandmother's inability to understand the child's problems and the damage it had sustained, though she was with the child for 2 weeks following its birth and for 2 weeks more when the child and the parents visited with the grandparents at their home in Illinois.

Three issues are presented.

ISSUE ONE. Was sufficient evidence presented to support the order permanently depriving the parents of their child?

ISSUE TWO. Did the juvenile court err in not appointing separate counsel for each of the parents?

ISSUE THREE. Did the juvenile court err in entering an order depriving the grandparents of any legal priority to the care, custody and control of the child?

## DECISION

ISSUE ONE.

CONCLUSION. The legal requirements for permanently depriving the parents of the custody of their child have been satisfied in this case, and the grounds therefore established by the requisite degree of proof.

■■ In all cases where the issue is whether or not parents will be permanently deprived of the custody of their child, the following 10 principles must be considered as basic.

1. A parent's interest in the custody and control of his or her minor child is so worthy of deference as to have been characterized as a "sacred right." *In re Hudson,* 13 Wn.2d 673, 678, 126 P.2d 765 (1942); *Moore v. Burdman,* 84 Wn.2d 408, 411, 526 P.2d 893 (1974).

2. The fact that a child might be better educated, better clothed and have a more pleasant home with someone other than the parent can have no weight with the court as against the natural rights of the parent. *In re Neff,* 20 Wash. 652, 655, 56 P. 383 (1899); *In re Day,* 189 Wash. 368, 381, 65 P.2d 1049 (1937).

3. However, permanent deprivation of parental rights in a child may be ordered by the juvenile court on a finding of dependency under any of the subsections of the statute defining dependent children. *In re Hauser,* 15 Wn. App. 231, 232, 548 P.2d 333 (1976); RCW 13.04.010; RCW 13.04-.095; RCW 13.04.100.

4. The paramount consideration must in all deprivation cases be the welfare of the child. Consequently, when the rights of the parents and welfare of their child are in conflict, the welfare of the minor child must prevail. *Todd v. Superior Court,* 68 Wn.2d 587, 591, 414 P.2d 605 (1966); *In re Sego,* 82 Wn.2d 736, 738, 513 P.2d 831 (1973).

5. Each such case must necessarily be decided on its own peculiar facts. *In re Ward,* 39 Wn.2d 894, 895, 239 P.2d 560 (1952).

6. The trial court is accorded broad discretion in reaching its decision.

> While our statutes and judicial opinions may set forth the goal, the criteria for establishing the best interests for the welfare of the child are conspicuous by their absence. The complexity of the cases and the need for careful individual treatment militates against the mandatory consideration of certain specified factors in every case.

Nevertheless, the courts have broad discretion and are allowed considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights.

(Citations omitted.) *In re Becker,* 87 Wn.2d 470, 477–78, 553 P.2d 1339 (1976).

7. For an order of permanent deprivation to be sustained on appeal, the findings of fact of the trial court must be supported by substantial evidence. In this context, "substantial evidence" means clear, cogent and convincing evidence showing the necessity for permanent deprivation to be highly probable. *In re Sego, supra* at 739; *In re Price,* 13 Wn. App. 437, 439, 535 P.2d 475 (1975).

8. Deprivation cases are inherently difficult.

Matters of child custody by their very nature present extremely difficult problems to trial and appellate courts, particularly when a natural parent is striving to maintain custody of an offspring in the face of persuasive indications or allegations of dependency or delinquency status. However, the judicial decision–making process still must function and operate in specific instances in the troublesome child custody area as well as in others, reflecting, of course, hopefully insofar as humanly possible, objective evaluation of the facts, the applicable social standards, and the legal issues presented.

*Todd v. Superior Court,* 68 Wn.2d 587, 591, 414 P.2d 605 (1966).

9. As an appellate court, we are constitutionally unable to substitute our findings for those of the trial court in any case. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959); *Charles Pankow, Inc. v. Holman Properties, Inc.,* 13 Wn. App. 537, 542, 536 P.2d 28 (1975). This is particularly true in child deprivation cases where

As an appellate tribunal, we are not entitled to weigh either the evidence or the credibility of witnesses even though we may disagree with the trial court in either regard. The trial court has the witnesses before it and is

able to observe them and their demeanor upon the witness stand. It is more capable of resolving questions touching upon both weight and credibility than we are.

*In re Sego, supra* at 739–40.

10. As the State Supreme Court has expressed it, "we have often noted what we think is a realistic and rational appellate policy of placing *very strong* reliance on trial court determinations of what course of action will be in the best interests of the child." *Todd v. Superior Court, supra* at 591. *Accord, In re Sickles,* 42 Wn.2d 17, 19, 252 P.2d 1063 (1953); *In re Three Minors,* 50 Wn.2d 653, 656, 314 P.2d 423 (1957).

As with most general principles, however, they are more easily expressed than applied.

The primary thrust of the parents' appeal is that insufficient evidence was presented to justify their being permanently deprived of their child. We disagree.

While the parents' *rights* to the custody of their child are undoubtedly fundamental, so too are their *obligations.* Our recent holding in a nonsupport case is apropos:

A parent's obligation to support and care for his or her child is a basic tenet of our society and law. *State v. Williams,* 4 Wn. App. 908, 912, 484 P.2d 1167 (1971). . . .

It is clear in reason, as well as law, that the primary obligation for the support and care of a child is on the parents who bring the child into the world rather than on the taxpayers of the State.

*Lizotte v. Lizotte,* 15 Wn. App. 622, 626, 551 P.2d 137 (1976).

This child was 1 year old before the petition of permanent deprivation was filed against the parents. He had spent more than 10 months of his young life in foster home care. Until the juvenile court trial, the parents had expressed no desire to have the child back in their full–time custody.

The findings and record reflect that, because of the parents' own problems, they were willing to let their child be raised and his daily needs administered to in a foster home;

and that, as to this arrangement, there was no foreseeable end in sight. A child is entitled to more than this.

■ The decision as to the point at which the parents will be required to face up to their obligations as parents or face deprivation on the basis that the child has "no parent or guardian willing to exercise, or capable of exercising, proper parental control" and is therefore, a dependent child, is an issue for the trial court to decide. RCW 13.04.010(2); *In re Russell,* 70 Wn.2d 451, 454, 423 P.2d 640 (1967).

Based on our review of the findings and of the record certified to this court, legally sufficient evidence was presented to support the order of permanent depr·vation. *In re Sego, supra; In re Price, supra.*

ISSUE TWO.

CONCLUSION. No showing of necessity for separate counsel in juvenile court has been made by the parents; nor did they request separate counsel.

The parents are represented by one attorney in this court and were represented by one attorney, though a different one, in juvenile court. They here argue that the juvenile court erred in not appointing separate attorneys for them in that court.

At the outset we are met with the proposition that no request for separate legal counsel was made in juvenile court; nor was this theory ever presented there.

Additionally, it may be stated generally, that a lawyer represents conflicting interests when, on behalf of one client, it is the lawyer's duty to contend that which the lawyer's duty to another client requires him or her to oppose. 31 A.L.R.3d 715. *See* (CPR) DR 5–105.

■ The fact that the parents had domestic problems between themselves does not alone establish the existence of a conflict in a legal sense. This deprivation proceeding was brought against both of them, and each of them defended, arguing fitness. Further, both parents testified in juvenile court that they intended to continue their marriage.

The parents have a constitutional right to be represented by legal counsel in a permanent deprivation case and, if indigent, are entitled to have counsel appointed for them at public expense. *In re Luscier,* 84 Wn.2d 135, 524 P.2d 906 (1974). They were so represented here. No showing has been made which persuades us that the parents' attorney in juvenile court did not fairly, adequately, and fully represent the interests of both parents. This assignment of error is not well taken.

ISSUE THREE.

CONCLUSION. Grandparents will ordinarily be favored in custody proceedings against those other than parents, but such preference does not prevent the grandparents' claim from being rejected when the paramount consideration of the child's welfare requires it.

■ The grandparents argue that a child, who has capable grandparents who are willing to exercise parental control and who have requested custody of the child, is not a dependent child. They base part of their argument on the statute which provides that

"dependent child" shall mean any child . . .

. . .

(2) Who has no parent, guardian *or other responsible person;* or who has no parent or guardian willing to exercise, or capable of exercising, proper parental control;
. . .

(Italics ours.) RCW 13.04.010(2). As this aspect of their argument goes, since they are trustworthy people, they are "responsible persons" and therefore the child was not within the statutory definition of dependency.

We hold that the term "responsible person" in RCW 13.04.010(2) is used in the sense of a "legally" responsible person and refers to persons who are liable, legally accountable or answerable for the child. Black's Law Dictionary 1476 (4th rev. ed. 1968). The grandparents were not legally responsible for their grandchild, and therefore this argument fails.

The grandparents further argue that when the parents of a child are permanently deprived of custody, then the grandparents become its natural guardians and are entitled to custody if found to be fit and proper persons capable of caring for the child. They cite *State ex rel. Michelson v. Superior Court,* 41 Wn.2d 718, 251 P.2d 603 (1952), a 5–to–4 opinion of our State Supreme Court.

While there appears to be some conflicting language in *Michelson,* a careful reading of that opinion satisfies us that it is in accord with the general rule concerning preferential status of grandparents. This is stated in *Award Of Custody Of Child Where Contest Is Between Child's Grandparent And One Other Than Child's Parent,* Annot., 30 A.L.R.3d 290, 304 (1970):

> In child custody contests between the child's grandparent and one other than the child's parent, the rule is so generally recognized as not to require citation of authority that the child's welfare is the paramount consideration. However, it has been held that, everything else being equal, a grandparent will be favored in a custody proceeding against someone other than a parent. More often it has been held that the fact that some of the parties are grandparents cannot be allowed to control, that a grandparent's status does not per se confer any inherent right to custody of a grandchild, . . .

(Footnotes omitted.) And further,

> In some instances the grandparent's superior claim to custody of his grandchild as against all others except the parents has been based on the grandparent's status as the child's natural guardian. However, the recognition of such a status for the grandparent has not prevented the grandparent's claim from being rejected if other circumstances warranted it.

(Footnotes omitted.) 30 A.L.R.3d 305.

 No preferential rights accorded to grandparents are superior to the right of the child to have its best interests and welfare protected. While the ruling of this court on the issue of the grandparents' rights might have been other than that of the trial court were we the trier of the fact, we will not substitute our finding for that of the trial court

which had the witnesses and parties before it. *In re Sego,* *supra.*

The circumstances of this case, as found by the trial court, were legally sufficient to warrant that court's rejection of the grandparents' claim to any legal priority to the child's custody.

■ The grandparents also argue that the trial court erred in holding the disposition hearing concerning their rights prior to the parents being permanently deprived of their rights. This contention is not in accord with the record.

The grandparents were entitled to intervene in the case and to have a hearing as to their fitness. *In re Maurer,* 12 Wn. App. 637, 640, 530 P.2d 1338 (1975). They were granted this right, had the full opportunity to present their case and did so.

Before holding a disposition hearing as to the grandparents' rights, the juvenile court first entered its findings of fact and concluded that the parents should "be permanently deprived of all parental rights". The grandparents were thus full apprised of the posture of the case by the time they argued their proposed disposition to the juvenile court. The fact that the final order with respect to both the parents' rights and the grandparents' rights was entered on the same date is therefore not material and not error. It may also be observed that possible confusion over separate appellate review deadlines was avoided by the juvenile court entering its final order with respect to all parties on the same date.

Affirmed.

SWANSON and WILLIAMS, JJ., concur.

Petition for rehearing denied April 28, 1977.