[No. 4471–8–III.   Division Three.   August 24, 1982.]

*In the Matter of the Welfare of* DENNIS FERGUSON.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES,
*Respondent,* v. FRANK FERGUSON,
*Appellant.*

*Charles B. Phillips* and *Taggart & Phillips,* for appellant.

*Arthur R. Eggers, Prosecuting Attorney,* and *M. Scott Wolfram, Deputy,* for respondent.

*Reese, Baffney, Schrag & Siegel, P.S.,* by *Larry Siegel,* as guardian ad litem.

MUNSON, J.—Mr. Frank Ferguson appeals the termination of his parental rights to his son, Dennis Ferguson, arguing the trial court's findings are without substantial evidence. We find clear, cogent and convincing evidence to support a finding that Dennis was dependent. There is an insufficient quantum of evidence, however, that the Department of Social and Health Services has provided reasonable services to help Mr. Ferguson become a better parent or that Mr. Ferguson is unlikely to become a better parent in the future.

DSHS initiated termination of Mr. and Mrs. Ferguson's parental rights to Dawn, approximately 12 years of age, and Dennis, approximately 9 years of age.[1] The record indicates the following: Mr. Williams of DSHS first contacted the Ferguson family on November 6, 1979, because of Dennis' behavior in school. Mr. Williams' second contact with the family occurred on December 6, 1979, when Dawn's schoolteacher called DSHS concerning alleged abuse of Dawn. DSHS placed the children in shelter care because of the abuse complaint and because the Ferguson home was unclean. The Fergusons cleaned their home and the children were returned after 5 days.

DSHS provided counseling and homemaker services to help the Fergusons become a stable family unit. Mr. Williams testified Mr. Ferguson was uncooperative with the homemaker; Mr. Ferguson testified he used the homemaker services as much as possible, but believed it interfered with his school schedule. Mr. Williams testified the Fergusons attended counseling from mid–December until mid–February 1980.

On February 8, 1980, both children were removed from the home because of allegations Dawn had been sexually abused by Mr. Ferguson. There was no allegation of abuse

---

[1] Mr. Ferguson is not Dawn's natural father nor legal guardian; no issue at the termination hearing or upon appeal relates to a claim of his parental rights to Dawn. Mrs. Ferguson also appealed the termination of her parental rights to both children. She has since explicitly abandoned the appeal. We express no opinion concerning the merit of any issue which she may have raised.

toward Dennis. Mr. Ferguson fled the state on February 12, 1980.

Dennis was placed in shelter care and, on March 17, 1980, found dependent based on allegations of abuse and neglect. Mrs. Ferguson was ordered to obtain counseling, change her circle of friends and clean up the family home. Because Mr. Ferguson was absent, he was not mentioned. He returned to the state May 5, 1980, was found guilty of taking indecent liberties with Dawn and incarcerated until early January 1981.

Mrs. Ferguson failed to comply with the court's orders. Finally, after she left the state in late November, DSHS filed petitions to terminate the parental rights of both Mr. and Mrs. Ferguson. The permanent deprivation hearing was held February 17, 1981, approximately 1 month after Mr. Ferguson's release from jail.

At the deprivation hearing, Mr. Williams testified concerning emotional abuse and neglect in the Ferguson home, but he did not personally know of any incidents where Mr. Ferguson had physically abused Dennis. Dennis testified, in chambers, to one incident of excessive discipline, but also stated he thought his father was "A-okay" and said he loved him. Mrs. Ferguson also related one incident which she witnessed in Illinois where Mr. Ferguson raised a welt on Dennis' stomach with a belt; she testified Mr. Ferguson was spanking Dennis on the buttocks and Dennis turned over quickly. Mr. Ferguson denied both incidents, but admitted he sometimes lost his temper and struck too hard. These two incidents, combined with the condition of the house, provided sufficient evidence to conclude Dennis and Dawn were abused, neglected and therefore dependent.

The difficult question is whether clear, cogent and convincing evidence was extant concerning the likelihood Mr. Ferguson's parental skills would not improve if provided with "necessary services, reasonably available, capable of correcting the parental deficiencies . . ." *See* RCW 13.34-

.180(4) and (5)[2] and RCW 13.34.190.[3]

■ The United States Supreme Court recently stated:

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

(Footnote omitted.) *Santosky v. Kramer,* 455 U.S. 745, 753–54, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982). Noting how final and irrevocable a termination of parental rights is, the Court held that parental rights may not be terminated absent clear, cogent and convincing evidence showing "permanent neglect", *i.e.,* "a judicial determination that the parents are unfit to raise their own children." *Santosky v.*

---

[2]RCW 13.34.180(4) and (5) state:

"A petition seeking termination of a parent and child relationship may be filed in juvenile court. Such petition shall conform to the requirements of RCW 13.34-.040 *as now or hereafter amended* and shall allege:

". . .

"(4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and

"(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; . . ."

[3]RCW 13.34.190 states:

"After hearings pursuant to RCW 13.34.110, the court may enter an order terminating all parental rights to a child if the court finds that:

"(1)(a) The allegations contained in the petition as provided in RCW 13.34-.180(1) through (6) are established by clear, cogent, and convincing evidence; or (b) RCW 13.34.180(3) may be waived because the allegations under RCW 13.34-.180(1), (2), (4), (5), and (6) are established beyond a reasonable doubt; or (c) the allegation under RCW 13.34.180(7) is established beyond a reasonable doubt; and

"(2) Such an order is in the best interests of the child."

*Kramer,* at 760.

Our statutory scheme and case authority parallel the United States Supreme Court's position; we have, since *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973), required clear, cogent and convincing evidence of past abuse and future unfitness prior to termination of parental rights. *In re Aschauer,* 93 Wn.2d 689, 611 P.2d 1245 (1980); *In re Becker,* 87 Wn.2d 470, 553 P.2d 1339 (1976); *In re Day,* 189 Wash. 368, 65 P.2d 1049 (1937); *In re Tarango,* 23 Wn. App. 126, 129–30, 595 P.2d 552 (1979).[4]

At the close of all testimony, the court terminated the parental rights of both parents to both children. Noting the services that had been provided were limited because of Mr. Ferguson's incarceration, the court believed they were all that could reasonably be offered. The court also found "there's little likelihood that the conditions will be remedied so the children can be returned to the parents in the near future. Insofar as Mr. Ferguson is concerned, I am really speaking of physical abuse of the child Dennis." Based on both statutory analysis and applicable case law, we believe the trial court was too hasty.

██ The language of RCW 13.34.130(3)(b)(iv) and RCW 13.34.180(4) indicate the purpose for the services is to facilitate the return of the child to his parents. Where the record indicates the offer of services would be futile, *see In re Aschauer, supra* at 699 n.6, or the prison term is so long the parent has little hope, even with counseling, of establishing a relationship with the child, *see In re Clark,* 26

---

[4]In *Santosky v. Kramer,* at 756, the Court stated:

"This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.' *Addington* v. *Texas,* [441 U.S. 418, 424, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979)]. Notwithstanding 'the state's "civil labels and good intentions,"' *id.,* at 427, quoting *In re Winship,* [397 U.S. 358, 365–66, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970)], the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government–initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.' 441 U. S., at 425, 426."

Wn. App. 832, 611 P.2d 1343 (1980), clear, cogent and convincing evidence would support a finding that reasonable services had been offered. Here, however, Mr. Ferguson received little counseling even though he was out of contact for only 11 months.

Moreover, Mr. Williams testified that Mr. Ferguson, while incarcerated, asked to meet with him on four or five occasions to discuss his future relationship with Dennis. Mr. Ferguson was allowed to see his son once and sent a birthday and Christmas present to him. Finally, Mr. Ferguson testified he wanted to learn new discipline methods, was willing to attend a mental health program, had completed a job training program, and wished for Dennis to remain a dependent for a reasonable time until he could "partake of the services that are offered that would make me a good parent."

Without a showing that Mr. Ferguson is incapable of changing after receiving adequate help from the State, we cannot find it "highly probable" he will not learn to be a parent to Dennis. *In re Sego, supra.* Here, there is no evidence the offer would be futile and we are loath to affirm the termination of Mr. Ferguson's parental rights without such evidence. We hold that neither RCW 13.34.180(4) nor (5) has been proved by clear, cogent and convincing evidence.

We reverse with orders that Dennis be maintained in foster care while DSHS provides "reasonably available" services to help Mr. Ferguson correct "his parental deficiencies". RCW 13.34.180(4). If after a hearing in 6 months, the trial court finds all elements of RCW 13.34.180 have been established as required by RCW 13.34.190, the trial court may terminate the parent–child relationship.

ROE, A.C.J., concurs.

GREEN, J. (dissenting)—I am compelled to dissent. Dennis had three sets of foster parents by the time of trial. He has been in dependent status for 2½ years. Now we ask

him to wait another 6 months so that Mr. Ferguson can receive services (the extent of which are undefined) as though all deficiencies will, or indeed can, be corrected within that time. In my view, the trial court arrived at a conclusion which is in Dennis' best interest after applying the clear, cogent and convincing standard of proof to the evidence and weighing all the factors. To overturn the court's decision is to reweigh the evidence, which is not in our province. The court's findings are supported by substantial evidence, and its decision should be affirmed.

The record shows a history of abuse of both children—reports of bruises on their buttocks, legs, welts on Dennis' stomach—all variously explained away by Mr. Ferguson. The Department became involved with the family when complaints were received by the school of bruises on Dawn and disciplinary problems with Dennis. The home was reported as being in "deplorable condition with dirt, filth."[5] The children were without proper clothes and were not eating "as well as they could." Mr. Ferguson refused to cooperate with the homemaker services which were offered, and the condition in the home remained unchanged. He thought the home was adequate. Counseling sessions were set up but were interrupted, not through the fault of the Department, but because of another complaint—this time for sexual abuse of Dawn, a process which had been ongoing since she was 2½ to 3 years of age. Mr. Ferguson then left the jurisdiction. He eventually returned, was convicted of indecent liberties with Dawn, and was incarcerated. He

---

[5] Mr. Williams, the caseworker for DSHS, stated: "Condition of the house was very bad. The children were eating a small plate of scrambled eggs. The house was—it's difficult for me to describe, because it conjures up different meanings for different people. But there was debris everywhere, dirt out of flower pots on the floor strewed around, ashes, cigarette butts on the floor. The carpet in that trailer home was just kind of caked with dirt and debris. The cupboard and drainboard were filled with dirty dishes. There is a large dog that was in the house at the time, and I can see that the dog had been eating some meat. There was dog bones, beef bones around on the floor. And there was redness from the blood of the beef that was still on the bones, and the house was just in deplorable condition with dirt, filth."

denied having committed the crime and refused to become involved in a sexual psychopath program. At the time of the termination hearing, he was unemployed, living in a 1–room apartment and had made no provisions to have Dennis with him. Mr. Williams, the caseworker who observed these children, the home, and both parents, testified the children should not be returned to either parent and final resolution of the issue was important to the children's stability.

Despite Mr. Ferguson's denials and his contention the services offered by the Department were inadequate, the court found he physically abused both children and the services offered were *reasonable* in light of his incarceration. As the majority recognizes, the pattern of abusive and violent behavior here was sufficient evidence that Mr. Ferguson was an unfit parent.[6] Nevertheless, it holds Mr. Ferguson should be given additional time to demonstrate he can be a fit parent. It is not suggested what services should be provided or why postponing disposition for an additional 6 months will correct parenting deficiencies, which apparently have existed throughout the children's lives, and which Mr. Ferguson refuses to recognize exist. In my opinion, the evidence sufficiently shows the futility of offering further services to him. The majority's holding incorrectly places Mr. Ferguson's desires over Dennis' welfare.

RCW 13.34.180(4) provides the state must offer all nec-

---

[6]The record shows Mr. Ferguson would strike Dawn when she refused his sexual advances. Even without the evidence of physical abuse of Dennis, the brutality Mr. Ferguson exhibited toward Dawn would be sufficient to declare Dennis dependent. As was stated in *In re Miller,* 40 Wn.2d 319, 323, 242 P.2d 1016 (1952):

> Where the finding of dependency and the need of removing the children from the custody of their parents is based upon a showing as to the personal traits and characteristics of the parents, we do not believe that there must be specific findings relative to the welfare of each individual child. For example, if the finding that the father is brutal and sadistic is borne out by testimony of brutal treatment of one child, that would be sufficient, in the court's discretion, to warrant removal of all children from his custody. A father does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state.

essary services which are *reasonably* available to correct parenting deficiencies within the *foreseeable* future. Whether this element is met should not be determined in a vacuum, but must be viewed against the paramount consideration of the best interests of the child under the particular facts of the case. RCW 13.34.190(2); *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973). While the parents have a fundamental right to custody of their child, it has been consistently recognized that when the parents' rights conflict with the child's best interests, the welfare of the child must control. *In re Aschauer,* 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *In re Sego, supra* at 738; *Todd v. Superior Court,* 68 Wn.2d 587, 591, 414 P.2d 605 (1966); *In re Schulz,* 17 Wn. App. 134, 139, 561 P.2d 1122 (1977).

In *In re Aschauer, supra,* the court addressed facts similar to this case. There the Court of Appeals, although recognizing the mother had emotional problems, reversed a trial court's termination of her parental rights to give her further opportunity to demonstrate her parenting capabilities. The Supreme Court reversed the Court of Appeals, stating at pages 694–95:

> To postpone [the children's] access to stability in the hope that the mother will be able to correct deep–seated emotional problems and assume the obligations of parenthood, when all the evidence shows that she lacks the capacity to do so, is to ignore the desperate needs of the children.

In J. Goldstein, A. Freud, & A. Solnit, *Beyond the Best Interests of the Child* 43 (1973), the authors criticize extending the period of uncertainty for a child in making what are often difficult decisions in child custody matters:

> The procedures of child placement are not designed to assure a prompt final decision. The process is characterized by extended periods of uncertainty caused by over-cautious and overworked administrative agencies; by courts with overcrowded dockets, extended and oft–postponed hearings; and by judges who are inclined to procrastinate before rendering their decisions at trial or on appeal.

The authors further state at page 43:

> Whatever the cause of the time–taking, the costs as well as the benefits of the delay to the child must be weighed. Our guideline would allow for no more delay than that required for reasoned judgment. By reasoned judgment we do not mean certainty of judgment. We mean no more than the most reasonable judgment that can be made within the time available—measured to accord with the child's sense of time. Therefore, to avoid irreparable psychological injury, placement, whenever in dispute, must be treated as the emergency that it is for the child.*
>
> *Three months may not be a long time for an adult decisionmaker. For a young child, it may be forever.

The trial court here considered the effect of leaving custody of Dennis with either or both his parents, retaining him in dependent status for a longer period, separating him from his sister, and his potential for being adopted. In light of all those considerations, the court found it was in Dennis' best interest that Mr. and Mrs. Ferguson's parental rights be terminated and that Dennis be placed in a foster home with his sister or in a situation where he could maintain a reasonably normal brother–sister relationship with her. The court further ordered Dennis' status be reviewed every 6 months until he was adopted. The court's resolution was based on all the facts and was designed to bring emotional stability into Dennis' life. My colleagues' decision undoes this resolution based on a restrictive interpretation of the statute.

> While our statutes and judicial opinions may set forth the goal, the criteria for establishing the best interests for the welfare of the child are conspicuous by their absence. The complexity of the cases and the need for careful individual treatment militates against the mandatory consideration of certain specified factors in every case. . . . [T]he courts have broad discretion and are allowed considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights.
>
> . . .

. . .
. . . As an appellate court, we are constitutionally unable to substitute our findings for those of the trial court in any case. . . . This is particularly true in child deprivation cases . . .

. . . As the State Supreme Court has expressed it, "we have often noted what we think is a realistic and rational appellate policy of placing *very strong* reliance on trial court determinations of what course of action will be in the best interests of the child."

*In re Schulz, supra* at 139–41.

I conclude there was substantial evidence here showing that the necessity for permanent deprivation was highly probable and would affirm the trial court's resolution of the difficult issues presented in this case.

Reconsideration denied September 15, 1982.

Review granted by Supreme Court December 3, 1982.